**James J. CUNNINGHAM, Jr. and Trina Cunningham, Plaintiffs Below, Appellants,**

**v.**

**Evan McDONALD and Securiguard, Inc., Defendants Below, Appellees.**

**No. 422, 1995.**

Supreme Court of Delaware.

Submitted: Oct. 8, 1996.

Decided: Jan. 22, 1997.

Bayard J. Snyder, Snyder & Associates, P.A., Wilmington, for Appellants.

Edward T. Ciconte, Ciconte, Roseman & Wasserman, Wilmington, for Appellee Evan McDonald.

Steven T. Davis and James F. Bailey, Jr. (argued), Bailey & Wetzel, P.A., Wilmington, for Appellee Securiguard, Inc.

Before WALSH, HOLLAND and BERGER, JJ.

BERGER, Justice:

This is an appeal from a defense verdict in a personal injury action. Appellants, James J. Cunningham, Jr. and Trina Cunningham, were seriously injured when their automobile collided with a pickup truck driven by appellee, Evan McDonald. At trial, the parties gave very different accounts of the accident, and each side relied on medical experts to bolster their positions. The Cunninghams argue that an opinion given by McDonald's expert, based on extrapolation of blood alcohol content, was inadmissible. They also complain that they were improperly precluded from cross-examining McDonald's expert about the expert's current employment status. Finally, the Cunninghams contend that they should be granted a new trial because McDonald made improper statements in his closing argument and the trial court's curative instruction was ineffective.

We hold that the trial court did not abuse its discretion in allowing an expert to use extrapolation to determine a person's blood alcohol content. The trial court's ruling on the scope of cross-examination, however, unfairly prejudiced the Cunninghams. The jury learned that McDonald's expert, Dr. Ali Hameli, is the Chief Medical Examiner for the State of Delaware and that Dr. Hameli is on paid administrative leave. The jury did not learn that Dr. Hameli's employment as Chief Medical Examiner is the subject of litigation and that his continued employment in that capacity is uncertain. Because the importance and prestige of Dr. Hameli's position undoubtedly added to the jury's assessment of his credibility, the Cunninghams should have been permitted to attack Dr. Hameli's credibility through limited cross-examination about his administrative leave and current activities. In light of our conclusion that the Cunninghams are entitled to a new trial, we need not consider whether the trial court's curative instruction was an adequate response to McDonald's improper closing statements. It is sufficient to note that similar statements should not be repeated at the next trial.

I.

The parties' head-on collision occurred at about 2:30 a.m. on the morning of April 22, 1991. Trina Cunningham had been out with friends at a bar in Delaware City. She decided that she was intoxicated and should not drive home, so she called her husband at about 11:00 p.m. and asked him to pick her up. James agreed, but did not come immediately. When he arrived at the bar, he saw an old friend and his cousin. James had one beer with them and the group then went to another bar. After another round of beers, the group went to a third bar. That bar appeared to be closed, so James and Trina started home. James testified that he was driving eastbound on Route 9, a two-lane road that has a paved shoulder. James was traveling at about 45 miles per hour when he saw McDonald's vehicle, in the middle of the road, approaching from the opposite direction. McDonald's vehicle had its high beams on and James flashed his own high beams while moving as far to the right side of the road as he could go. McDonald's vehicle did not alter its course and the pickup

truck collided with the front, driver's side of the Cunninghams' car. Detective John R. Evans, the officer who investigated the accident, confirmed a portion of James' account. The detective determined that the point of impact was approximately one foot north of the shoulder line in the eastbound lane of Route 9.

McDonald had a different recollection of the accident. McDonald is a native of Jamaica, where people drive on the left side of the road. He moved to the United States two months before the accident, and was living with his sister and her family in New Castle, Delaware. McDonald obtained a Delaware driver's license in March 1991 and started work as a security guard on April 6, 1991. At the time of the accident, McDonald was working the graveyard shift and was driving from one security guard station to another at the Star Enterprises plant in Delaware City. McDonald testified that, shortly after turning onto Route 9, he noticed a bright light coming toward him. McDonald thought the oncoming vehicle was in his lane and he hit the brakes. The oncoming vehicle returned to its own lane but, within a few seconds, it swerved back into McDonald's lane. McDonald testified that he had no time and swerved into the eastbound lane to avoid a collision. The other vehicle also went back to the eastbound lane and the two vehicles collided.

McDonald and the Cunninghams were taken to the hospital following the collision. McDonald was in a coma for the next five days and for many months thereafter he had very limited recall of the events preceding the accident. James and Trina, although seriously injured, were conscious and able to give brief statements to Detective Evans at the hospital. Both Cunninghams told Detective Evans that they had been drinking earlier in the evening and the detective noticed a moderate odor of alcohol on James' breath. As a result, Detective Evans ordered a blood alcohol test, which was performed at 4:30 a.m. The blood tested by the State Police showed an alcohol content level of .04 percent. An earlier blood test, performed by the Medical Center at 3:55 a.m., showed an alcohol content level of .08 percent.

The Cunninghams based their case on the theory that McDonald had fallen asleep at the wheel. Dr. Richard Schwab, a sleep disorder specialist, opined that the accident was caused by McDonald's sleep deprivation. McDonald tried to establish that James caused the accident by driving erratically after drinking several beers. Dr. Hameli interpreted the results of the two blood tests. The State Police test was performed on whole blood whereas the hospital test used the serum portion of the blood. Dr. Hameli adjusted for the difference between a serum and whole blood test result and then calculated James' blood alcohol content at the time of the accident by factoring in the rate at which the body burns alcohol and the amount of time that elapsed between the accident and the drawing of the blood samples. Since this extrapolation process yielded different results for the two blood samples, Dr. Hameli averaged the results. He concluded that, at the time of the accident, James had a blood alcohol content level of .07–.08 percent and that a person with that blood alcohol content would be under the influence of alcohol and would be mildly to moderately impaired.

## II.

The Cunninghams argue that Dr. Hameli should not have been permitted to offer expert opinions on James' blood alcohol content or degree of impairment at the time of the accident. The driving under the influence (DUI) statute sets forth the evidentiary weight that should be given to different blood alcohol test results and the Cunninghams contend that extrapolation evidence should not be allowed to contradict that statutory scheme. Even if the DUI statute does not render extrapolation evidence inadmissible, the Cunninghams argue that Dr. Hameli's opinions should have been excluded because they were speculative and unreliable. We are not persuaded by either argument.

DUI is proscribed in 21 *Del.C.* § 4177. The statute sets forth the evidentiary weight given to different alcohol concentration test results:

(a) No person shall drive a vehicle:

(1) When the person is under the influence of alcohol;

\* \* \*

(5) When the person's alcohol concentration is, within 4 hours after the time of driving, .10 or more.

\* \* \*

(g) For purposes of a conviction premised upon subsection (a) of this section, or any proceeding pursuant to this Code in which an issue is whether a person was driving a vehicle while under the influence, evidence establishing the presence and concentration of alcohol or drugs in the person's blood, breath or urine shall be relevant and admissible.

\* \* \*

(1) Evidence of an alcohol concentration of .05 or less in a person's blood, breath or urine sample taken within 4 hours of driving ... is prima facie evidence that the person was not under the influence of alcohol within the meaning of this statute. Evidence of an alcohol concentration of more than .05 but less than .10 in a person's blood, breath or urine sample taken within 4 hours of driving ... shall not give rise to any presumption that the person was or was not under the influence of alcohol, but such fact may be considered with other competent evidence in determining whether the person was under the influence of alcohol.

21 *Del.C.* § 4177.

The State Police blood sample, taken within 4 hours of the accident, showed that James had a blood alcohol concentration of .04. In a DUI prosecution, that test result would have been *prima facie* evidence that James was not under the influence of alcohol at the time of the accident. The hospital blood sample, showing a blood alcohol concentration of .08, would not have given rise to any presumption in a DUI prosecution. Yet Dr. Hameli was allowed to use the test results of the two blood tests to extrapolate a blood alcohol content of .07 to .08 and then to opine that a person with an alcohol concentration of .07 to .08 suffers mild to moderate impairment. The Cunninghams argue that, since

Dr. Hameli's extrapolation testimony contradicts the DUI statute, it should have been excluded.

■ We do not necessarily accept the Cunninghams' premise that the DUI statute precludes the use of extrapolation evidence in a DUI prosecution or other criminal proceeding. We need not decide that issue, however, as this is a civil action and there is nothing in § 4177 to suggest that the statute was intended to restrict the admissibility of evidence in general civil litigation. Accordingly, we conclude that the admissibility of Dr. Hameli's testimony is governed by the Delaware Rules of Evidence.

■ This Court recently adopted a 5–step test to determine the admissibility of scientific testimony, such as that offered by Dr. Hameli. The trial court must decide that: (i) the witness is "qualified as an expert by knowledge, skill, experience, training or education" (D.R.E. 702); (ii) the evidence is relevant and reliable; (iii) the expert's opinion is based upon information "reasonably relied upon by experts in the particular field" (D.R.E. 703); (iv) the expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue" (D.R.E. 702); and (v) the expert testimony will not create unfair prejudice or confuse or mislead the jury. *Nelson v. State*, Del.Supr., 628 A.2d 69, 74 (1993).

■ The Cunninghams do not contest Dr. Hameli's expert qualifications or the general scientific acceptability of blood alcohol extrapolation. Rather, they question the reliability of Dr. Hameli's conclusions. They point out that the results of the two blood tests were noticeably different. Dr. Hameli adjusted for the fact that the hospital used serum rather than whole blood and his extrapolation calculation took into account the fact that the two samples were taken at different times. Even after these adjustments, however, the two samples yielded different extrapolated blood alcohol concentration levels. Dr. Hameli was unable to determine which of the two samples was more accurate, so he decided to average them. The Cunninghams argue that, since

Dr. Hameli could not reconcile the two results, his conclusions were nothing more than an educated guess.

We find no error in the trial court's decision to admit Dr. Hameli's expert testimony. Dr. Hameli testified that extrapolation is a method of determining blood alcohol content that is reasonably relied upon by experts in his field. The Cunninghams do not question that. Dr. Hameli also explained how he interpreted the two blood test results, using averages for the conversion of serum to whole blood and averages for the alcohol burning rate. After making those calculations, the difference between the two blood samples was approximately .02 percent. Dr. Hameli could not determine which of the two results was more accurate, so he averaged them and concluded that James' blood alcohol concentration was "somewhere between" .07 and .08 percent at the time of the accident.

Dr. Hameli applied the same averaging approach to the extrapolation results as he did to the serum conversion and the burn rate. It is beyond question that averaging is a common, accepted method of reconciling data, and Dr. Hameli decided that it would be more appropriate to average the results than to reconcile the data by rejecting one of the tests or by assuming an unusually high alcohol burn rate. In short, Dr. Hameli was not guessing, as the Cunninghams suggest, and his analysis was not rendered unreliable by the fact that he used averaging as an interpretive tool. The Cunninghams raise no other objections to Dr. Hameli's testimony. Accordingly, we conclude that the trial court acted within its discretion in admitting it.

### III.

■ During *voir dire*, Dr. Hameli stated that he was the Chief Medical Examiner of the State of Delaware and that he was then on paid administrative leave. When the Cunninghams asked the reason for the paid administrative leave, the court interrupted, saying that it was not relevant. The court then asked Dr. Hameli whether he was waiting for a decision from the federal court, and Dr. Hameli agreed. The trial court later explained to counsel:

I cut you off in your interrogation of Dr. Hameli about his administrative leave because he has been charged with sexual harassment and there is a matter that is pending in the federal court and it was tried last winter and there hasn't been a decision issued. And at this time it's peripheral but in these proceedings I didn't want you to spend a lot of time getting into it because it has had so much press that I assumed that you knew that.

When the jury returned, after the *voir dire* concluded, Dr. Hameli testified about his position and qualifications as follows:

Q: Doctor, are you currently employed?

A: I am employed by the State of Delaware, but presently on paid administrative leave.

Q: What's your title with the State of Delaware, sir?

A: Chief Medical Examiner and Director of the Forensic Sciences Laboratory.

Q: You are an employee of the State of Delaware, is that correct?

A: Yes, sir.

\* \* \*

Q: In addition to the titles and the occupations that you told us about, have you ever had any type of special appointments as part of your background to any governmental agencies?

A: Well, I have had the honor of working with various professional and scientific societies and, in fact, in the State of Delaware I belong to the Delaware Medical Society and the New Castle County Medical Society. I served as the President of the Medical Society of Delaware in the past and I am a member of the National Association of Medical Examiners and served twice as the president of that organization.

I'm a member of the American Academy of Forensic Sciences and served as the vice-president of that organization. I also am a member of the College of American Pathologists.

In light of the fairly extensive testimony about Dr. Hameli's background and qualifications, the Cunninghams requested permis-

sion to ask Dr. Hameli one question about his employment status, "Isn't it true you were fired by the Governor?" The trial court did not allow the question.

"Cross-examination is the 'principal means by which the believability of a witness and the truth of his testimony are tested.'" *Snowden v. State,* Del.Supr., 672 A.2d 1017, 1024 (1996) (quoting *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)). Although the trial court has the discretion to limit cross-examination, it is important that the jury be "exposed to facts sufficient for it to draw inferences as to the reliability of the witness...." *Weber v. State,* Del.Supr., 457 A.2d 674, 682 (1983). In two recent cases, these general principles were applied in the context of cross-examination about termination from employment.

In *Snowden v. State, supra,* the witness was a former police officer who had been fired, allegedly for misconduct. On cross-examination, the defendant asked whether the police officer was still employed by the police department and he responded that he was not. The defendant then attempted to learn the reason for the police officer's termination, but the State's objection to that question was sustained. This Court reversed, holding that, "[t]he Superior Court's blanket restriction on further cross-examination regarding the reasons why [the police officer's] employment has ended violated [defendant's] confrontation rights under the Sixth Amendment and Article I § 7 of the Delaware Constitution." *Snowden v. State,* 672 A.2d at 1026.

Although *Snowden* was a criminal case, the *Snowden* court relied on the Third Circuit's analysis of the same issue in a civil context. In *Douglas v. Owens,* 50 F.3d 1226 (3d Cir. 1995), an Islamic religious leader, who had been employed by the Pennsylvania Department of Corrections, testified on behalf of a prisoner in a lawsuit alleging civil rights violations by prison guards in the Department of Corrections. On cross-examination, the prison guards attempted to establish that the witness had been fired because of his alleged involvement in a prison riot and his unwillingness to cooperate with authorities. The trial court would only allow counsel to

establish that the witness had been terminated. The Third Circuit noted that trial courts may place "reasonable limits on the scope of cross-examination, weighing such factors as undue prejudice, relevancy, and delay due to repetition." *Id.* at 1230. The appellate court concluded, however, that the trial court's limitation on cross-examination deprived the jury of the information it needed to make a fair appraisal of the witness:

> The word "terminated" and even the word "fired" is not sufficient to effectively portray to the jury any alleged bias, lack of credibility, and motives of the [witness]. The [witness] could have been terminated or fired for any number of "neutral" reasons which would not suggest to the jury that he was biased in favor of [plaintiff] and against [the prison guards]. Without further inquiry, the jury did not have sufficient information with which to make a discriminating appraisal of the [witness's] motives or bias. *Id.* at 1231.

The Third Circuit remanded with instructions that the trial court either allow limited cross-examination as to the facts of the witness's discharge or more expansive cross-examination combined with a limiting jury instruction.

The reasoning in *Snowden* and *Douglas* applies equally to Dr. Hameli's cross-examination. Dr. Hameli's expert testimony was crucial to McDonald's case. McDonald did not remember many details about the accident and, as the defendant in a lawsuit, his bias was apparent. Dr. Hameli was the only other defense witness and he opined, based upon scientific evidence, that James' driving was impaired at the time of the accident. In deciding whether to accept that opinion, the jury undoubtedly assessed Dr. Hameli's credentials as well as the basis for his opinion. Arguably the most impressive of Dr. Hameli's credentials was his position as the State's Chief Medical Examiner. Although the jury learned that Dr. Hameli was on paid administrative leave, there was no explanation of what that meant. As the Cunninghams point out, the jury could have mistakenly believed that the administrative leave was voluntary, in the nature of a sabbatical. In fact, Dr. Hameli's employment status is uncertain.

His employer attempted to terminate him, and Dr. Hameli is on paid administrative leave pending resolution of litigation concerning the attempted termination.

We hold that, in light of the importance of Dr. Hameli's position, it was error to prevent limited cross-examination concerning Dr. Hameli's employment status. The jury should have been given enough information to accurately appraise Dr. Hameli's credibility and potential bias. Since Dr. Hameli's employment status has not yet been resolved, it was proper to exclude all inquiry concerning the nature of his underlying dispute and the allegations that led to his attempted termination. *Cf. Snowden, supra; Douglas, supra.* Cross-examination should have been allowed, however, to elicit the fact that Dr. Hameli's employment status is the subject of pending litigation and that his future employment as Chief Medical Examiner is uncertain. In addition, Dr. Hameli could be asked about his professional activities during the administrative leave.

### IV.

 In its closing argument, Securiguard asked the jury to send a message to drunk drivers by finding in favor of the defendants:

> Ladies and gentlemen, you have a unique opportunity in this case. People often say why … doesn't someone do something about drunk drivers? Today you can do something. You can let them know that society doesn't tolerate people who drink too much and then drive…. You can send the right message. Don't reward them for drinking and driving.

The Cunninghams objected and the trial court gave a curative instruction. On appeal, the Cunninghams argue that the curative instruction was ineffective.

Since this case is being remanded for a new trial, we need not consider the trial court's curative instruction. *See DeAngelis v. Harrison,* Del.Supr., 628 A.2d 77 (1993). We simply note that the closing argument was improper and should not be repeated in the next trial. *University of Delaware v. Munson,* Del.Supr., 316 A.2d 206 (1974).

Based upon the foregoing, the judgment of the Superior Court is REVERSED and the matter is REMANDED for a new trial.