IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE          :   Def. ID# 1808011330

v.                        :

CLAY D. CONAWAY,         :

      Defendant.            :


MEMORANDUM OPINION


DATE DECIDED: July 30, 2019


Defendant's Motion to Sever - GRANTED

State of Delaware's Motion *in limine* - DENIED

Defendant's Motion to Dismiss Counts 2 and 3 - DENIED

Defendant's Motion for Production of *Brady* Material and for Bill of Particulars - DENIED


Casey L. Ewart, Esquire and Rebecca E. Anderson, Esquire, Department of Justice, 114 E. Market Street, Georgetown, DE 19947, attorneys for State of Delaware

Joseph A. Hurley, Esquire, 1215 King Street, Wilmington, DE 19801, attorney for defendant


Stokes, J.

This is a criminal action against Clay D. Conaway ("defendant") alleging he committed rape in the first degree against one alleged victim; rape in the second degree against three other alleged victims; two counts of rape in the second degree against a fifth alleged victim; and attempted rape in the second degree and strangulation against a sixth alleged victim. Pending before the Court are a number of motions: defendant's motion to sever the cases involving the six different alleged victims; the State of Delaware's ("the State") motion *in limine* to admit evidence under D.R.E. 404(b); defendant's motion to dismiss two counts of the indictment; and defendant's motion for production of *Brady*[1] materials and motion for a bill of particulars.

This constitutes my decision on those pending motions.

## I. Motion to Sever

Defendant seeks an order severing these cases into six cases, where the charges involving the six separate alleged victims are tried separately.

## A) Facts

The factual scenarios of each event are set forth in chronological order. For purposes of this motion only, defendant agrees the State of Delaware ("the State") has evidence to support the facts set forth below. Stated another way, defendant is not conceding these are the facts which will be established at trial but he is acknowledging these are the facts if viewed in a light most favorable to the State.

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

1

## 1) T.A.

Count 2 of the indictment charges defendant with committing the crime of rape in the second degree[2] against T.A., alleging that on or about or between the 1st day of September, 2013 and the 20th day of September, 2013, defendant did intentionally engage in sexual intercourse with T.A., without her consent.

T.A. and defendant were in high school together. He was a senior; she was 15-years-old. They were talking at school and exchanging information by social media. T.A. sent him "naughty" pictures. Defendant asked if he could come by her house one afternoon and she agreed. He entered her house, asked where the bedroom was, went immediately there, and laid on her bed. T.A. also went into the bedroom. They began kissing. T.A. started to feel uncomfortable and told defendant she had boundaries, which included keeping her pants on, and that she was not going to have sexual intercourse with him. Defendant said "ok" and told her he respected that.

They resumed kissing. Defendant pulled off T.A.'s pants, grabbed her legs and pushed them up by her head so that she was unable to move. Defendant took off his pants and put his penis into her vagina, without wearing a condom, and began having sex with her. T.A. reported she was in shock, it hurt badly, and defendant ignored her when she told him several different times to stop. His size and strength made it hard for her to physically resist him.

Defendant told her he was nearly done and she grabbed him by the neck and somehow

---

[2]In 11 *Del. C.* § 772(a)(1), it is provided:

> (a) A person is guilty of rape in the second degree when the person:
>     (1) Intentionally engages in sexual intercourse with another
>     person, and the intercourse occurs without the victim's consent....

2

pushed him off so that he would not ejaculate inside of her. Defendant then finished by masturbating until he ejaculated into a towel on the bed.

During this episode, T.A.,'s sister came into the room; T.A. told her sister that she would be with her shortly, and when the sister left, sexual activities resumed.

T.A. put her clothes back on. Defendant gave her a "high five" and complimented her by telling her she did a "good job." He told her to cheer up because she no longer was a virgin and she should be proud he was the one who took her virginity. He then left.

T.A. was extremely upset and told some friends about the episode. Defendant contacted her thereafter with texts, trying to get together with her again. T.A. told him she thought he was better than what his behavior showed that day.

## 2) J.E.

Count 3 of the indictment charges defendant with committing the crime of rape in the second degree against J.E., alleging that on or between the 31st day of December, 2013 and the 1st day of January, 2014, defendant intentionally engaged in sexual intercourse with J.E., without her consent as that term in defined in 11 *Del. C.* § 761(j)(1) and/or § 761(j)(2).[3]

---

[3]11 *Del. C.* § 761(j) provides:

(j) "Without consent" means:
    (1) The defendant compelled the victim to submit by any act of
    coercion as defined in §§ 791 and 792 of this title, or by force, by
    gesture, or by threat of death, physical injury, pain or kidnapping to
    be inflicted upon the victim or a third party, or by any other means
    which would compel a reasonable person under the circumstances
    to submit. It is not required that the victim resist such force or
    threat to the utmost, or to resist if resistance would be futile or
    foolhardy, but the victim need resist only to the extent that it is

3

Defendant and J.E. attended high school together. A New Year's Eve party took place December 31, 2013 through January 1, 2014 at another student's house. J.E. drank alcoholic beverages. In the early morning of January 1, 2014, she laid down and fell asleep. She woke up to find defendant having sex with her (penile/vaginal intercourse) with other people in the room. Her shirt was still on but her pants and underwear were gone. Defendant had pulled a blanket on top of them. When she realized what was happening, she told defendant to stop, to get off her, but he kept going. She told him again to stop but he ignored her. She told him to stop a third time. At that point, a male in the room verbally intervened, apparently saying, "You are basically raping her." Defendant stopped having sex with her and J.E. got up and headed to the bathroom, crying. Defendant, responding to the rape statement, said, "My dad is a retired State Trooper. Why would I be doing that?" and "I got a fucking scholarship. This can't be happening."

J.E. had not discussed sex with defendant at any point earlier in the night and she never had given him verbal permission to engage in sexual intercourse with her.

The majority of those at the party who were interviewed and saw what happened told investigators that J.E. was extremely drunk that night; she did not appear to be moving while defendant was on top of her having sex; and J.E. had to tell defendant to stop more than once before he actually did.

Later, defendant came into the bathroom where J.E. was with others and tearfully told her he was sorry and said something like, "Don't say I raped you or anything."

---

reasonably necessary to make the victim's refusal to consent known to the defendant....
(2) The defendant knew that the victim was unconscious, asleep or otherwise unaware that a sexual act was being performed; ....

4

Around noon on January 1, 2014, defendant texted J.E. Some of the others at the party did not think defendant was impaired, while at least one person thought defendant was intoxicated. Defendant sent J.E. texts indicating that both he and J.E. were extremely drunk. He continued texting her over the next few days imploring her not to say he had sex with her without her consent and telling her he did not rape her.

J.E. went to a counselor and told the counselor about what happened. The counselor called the police.

The State Police investigated the assaults against J.E. and T.A., but no charges were brought until 2018.

### 3) G.K.

Count 8 of the indictment charges defendant with committing the crime of attempted rape in the second degree against G.K., alleging that on or about or between the 1st day of November, 2017 and the 30th day of November, 2017, defendant did intentionally attempt to engage in sexual intercourse with G.K., without her consent, which acts, under the circumstances as he believed them to be, constituted a substantial step in a course of conduct planned to culminate in the commission of the crime of rape in the second degree. Count 9 of the indictment charges defendant with committing the crime of strangulation[4] against G.K., alleging that on or about the same time and place, defendant did knowingly or intentionally impede the breathing or

---

[4]In 11 *Del. C.* § 607, it is provided:

(a)(1) A person commits the offense of strangulation if the person knowingly or intentionally impedes the breathing or circulation of the blood of another person by applying pressure on the throat or neck of the other person.

5

circulation of the blood of G.K. by applying pressure to her throat or neck.

G.K. met defendant through a dating application named "Tinder."[5] Both were students at the University of Delaware. G.K. agreed to go to defendant's residence in Newark, Delaware, to meet with him. When she arrived, he took her directly to his bedroom. Once there, they sat down on a couch and began talking. G.K. told him she recently had ended a long relationship and was using the meeting to move forward. After about half an hour, defendant got up and sat on the edge of his bed. He grabbed hold of G.K. by her hip and threw her on his bed so hard that her head struck his headboard. He crawled on top of her, straddling her and holding her down with his body weight while touching her breasts over and under her shirt. G.K. attempted to hit defendant's hands away from her but he continued touching her. He then began pulling at her pants in an attempt to remove them. G.K. yelled at defendant and told him she did not come there to have sex with him. In response, defendant wrapped both of his hands around her neck and began to choke her. G.K. could not breath and thought she was going to die so she fought for her life by moving her body and head as much as she could. She finally was able to sit up and yelled at him, telling him to stop. Defendant let her go. When G.K. asked him what he was doing, he responded that he thought all girls were into that and asked her why had she come over, what was wrong with her.

Defendant texted someone and soon thereafter, two male roommates came into the bedroom and they escorted G.K. from the residence. She went home and told her roommate what had happened and called her mother via FaceTime. Her mother could see the red marks left by

---

[5]This application is not the one depicted by the defense in its February 22, 2019, Memorandum of Law in Support of Severance.

6

defendant's hands. Her roommate recalls G.K. complaining that her neck hurt.

G.K. at some point filed a complaint with the University of Delaware's Title IX office indicating that defendant had sexually assaulted her.

**4) K.L.**

Count 5 of the indictment charges defendant with committing the crime of rape in the second degree against K.L., alleging that on or about or between the 27th day of May, 2018 and the 30th day of May, 2018, defendant did intentionally engage in sexual intercourse with K.L., without her consent.

K.L. was staying at a friend's house in Dewey Beach, Delaware, over Memorial Day weekend. She met defendant, who was an acquaintance of a mutual friend at the beach house on May 26, 2018. On or about May 29, defendant came to the beach house and a group of them went out but had returned to the house by about 1:00 or 2:00 a.m. the next night/morning.

K.L. and another friend were lying in one of the beds when defendant came into the room, jumped on the bed between them and knocked K.L.'s friend off the bed. This friend left the room. Defendant closed and locked the door, turned off the light, and took off his shirt. Defendant got on top of K.L. and began kissing her, something she was fine with.

He then removed her pants and underwear and took off his own pants. K.L. told him she was not interested in having sex, out of respect for a friend who had dated defendant. Defendant told K.L. that was okay and they did not have to tell anyone, but his attempts to convince her did not work and she told him again that she did not want to have sex.

Defendant digitally penetrated K.L.'s vagina, K.L. told him no. She tried to push him off

7

of her but he was too heavy. Defendant told her it did not matter, it was already happening. He then put his penis in her vagina and began having unprotected sexual intercourse with her. She continued to tell him no but he ignored her. At one point, he removed his penis from her vagina and K.L. rolled over onto her stomach, thinking that defendant was done. However, he put his penis back into her vagina and had sex with her from behind for several more minutes. K.L. told defendant no one or two more times while that was going on.

When defendant pulled his penis out, K.L. rolled over on her back and defendant ejaculated on her stomach.

Afterwards, defendant played nice. K.L. played along because she wanted to get out of the situation. She suggested they go back downstairs.

K.L. then told one of her friends about what had happened. When defendant left the house, she told the other girls in the house about what he had done. K.L. had contact with defendant thereafter and she reiterated she had not wanted to have sex. Defendant later asked her not to tell anyone and said he wanted to keep it between the two of them.


## 5) M.P.

Count 1 of the indictment charges defendant with committing the crime of rape in the first degree[6] against M.P., alleging that on or about June 20, 2018, defendant intentionally

---

[6]In 11 *Del. C.* § 773(a)(1), it is provided as follows:

(a) A person is guilty of rape in the first degree when the person intentionally engages in sexual intercourse with another person and any of the following circumstances exist:
>    (1) The sexual intercourse occurs without the victim's consent
>    and during the commission of the crime, or during the immediate

engaged in sexual intercourse with M.P. without her consent and during the commission of the crime, caused physical injury to M.P.

Defendant and M.P. communicated by Instagram and Snapchat. The communications included photographs of defendant in the nude, displaying his genitalia. On June 20, 2018, they agreed to meet. In her communications, M.P. informed defendant she was not interested in having sex with him, especially in light of the fact she was having her menstrual cycle.

Defendant invited her to his home in Georgetown, Delaware. He lived in a detached pole barn on property his parents own. Defendant gave her directions to his home. She drove there and defendant met her outside and took her inside. She sat down on his bed at his invitation. They were watching a movie and under a duvet. They engaged in consensual kissing and cuddling. Then, defendant rolled on top of her and began taking off her clothes, including her underwear. He began saying things, such as "It's fine, don't worry about it," "we're just going to mess around," and "it's not a big deal." M.P. told him again that she did not want to have sex, and he assured her they were not. When she reminded him that she was having her period, he pulled her tampon out and threw it on the floor. He claimed he had a new tampon for her to use; he had gotten it from the main house from his mother's supply before M.P. arrived.

M.P. began to have an anxiety attack. Defendant got off of her and asked if she was okay. M.P. responded that she was anxious about what was going on and did not want to do this right now. When she asked for her underwear to be returned to her, defendant said no and said things were fine. M.P. insisted; defendant gave her her underwear back; M.P. put them back on. They

---

flight following the commission of the crime, or during an attempt
to prevent the reporting of the crime, the person causes physical
injury or serious mental or emotional injury to the victim....

9

then laid next to each other. Defendant placed her hand on his penis; M.P. stroked it a few times but then was overcome with anxiety. Then, defendant tried to pull M.P. on top of him. She objected and defendant said it was fine, they were just messing around.

M.P. told defendant she did not feel comfortable and she was going to leave. Defendant stuck his arm out as if to block her and told her she did not have to go. M.P. felt like she was frozen and was concerned with defendant's physical size. She ended up back on the bed.

Defendant then got on top of her. Although she tried to push him off, she was unable. She felt "frozen" and although she told defendant she did not want this to happen, the defendant kept going.

Defendant began "violently fingering" her vagina. At that point, his hand was touching her throat and she felt as if he was beginning to choke her. He removed his hand and held M.P.'s hair with a pulling motion while continuing to finger her vagina.

At one point, M.P. realized there was slight penetration of her vagina by defendant's penis and she "faked" an orgasm in an effort to have defendant discontinue that activity.

She tried to get away and told defendant he was hurting her. He kept telling her things were fine. He began having penile-vaginal intercourse with her, ignoring her efforts to get him to stop. Defendant pushed her legs back toward her head, an action which immobilized her. This push was so aggressive that she ending up having to go to the hospital more than 48 hours later due to continuing pain in her hips.

Defendant ejaculated on her stomach and wiped the semen off with an article of clothing. A short time later he told M.P. it was time for her to leave. She got dressed and left. Defendant told M.P. to text him when she arrived home and talked about seeing her again in the future.

10

M.P. called a friend and reported what happened; she was in tears. She then met with another friend and told her what happened. M.P. decided to go to the hospital for a sexual assault examination and to make a police report.

Defendant continued to text her about getting together again. M.P. did not respond.

### 6) A.L.

Counts 6 and 7 of the indictment charge defendant with committing the crimes of rape in the second degree against A.L., alleging that on or about or between the 19th day of July, 2018 and the 20th day of July, 2018, defendant did intentionally engage in two separate acts of sexual intercourse with A.L., without her consent.

A.L. and defendant began communicating in July, 2018 by way of social media. On July 19, 2018, A.L. agreed to meet with defendant in person. Before this face-to-face contact, A.L. told defendant she did not wish to engage in sexual intercourse with him and that she just wanted to get to know him. She happened to be on her period at the time. Defendant responded that there was no pressure and A.L. decided to meet with him.

She met him in the parking lot of a gym in Georgetown, Delaware. She got into defendant's vehicle and drove with him to the pole barn. There, they laid down on his bed to watch a movie. Defendant started kissing A.L., who kissed him back. He began touching her, and this made her feel uncomfortable. He pulled down her leggings and flipped her onto her stomach, took off his clothes, pulled her underwear to the side and rubbed his penis on her buttocks, flipped her back over and pulled off her underwear. A.L. said no at this point and told the defendant she really did not want to do this. Defendant told her to chill out, it was not a big deal.

11

He then pulled out her tampon and threw it on the floor. Defendant then got on top of her and forced himself inside of her without wearing a condom. He held her legs up to her chest as he penetrated her vagina with his penis, ignoring the fact that A.L. was crying. A.L. attempted to push him off, but he grabbed both her wrists, holding them above her head with one of his hands as he continued to have intercourse with her. Next, he flipped her over onto her stomach and had sex with her from behind. When he was finished, he pulled out his penis and ejaculated on her back.

After it was over, A.L. put her clothes back on. Because she did not have a way to leave and did not know what to do, she laid back down and continued watching the movie.

After a while, defendant again pulled her underwear and leggings off and pulled out a tampon, got on top of her, and had penile/vagina intercourse again. Defendant pulled her on top of him but she did not participate. She was "bawling her outs out, really crying." Defendant put her back on her stomach and ejaculated for a second time on her back.

After A.L. put her clothes back on, defendant asked her what was wrong and she told him that she really did not want to do that. Defendant did not respond.

Defendant eventually took her back to her car. A.L. told her best friend about what happened as soon as she was able to drive home.

Defendant thereafter tried to contact A.L. through social media. She made excuses and did not see him again. She then spoke to the police after defendant's arrest in August, 2018.

Defendant was indicted by the Grand Jury on a charge of Rape in the First Degree on August 20, 2018, and was arrested two days later. Other alleged victims came forward. Two more superceding indictments were filed, with the most recent one being filed on November 19,

12

2018. The superceding indictments included charges from the 2014 investigation.

## B) Defense

Defendant has responded as follows.

1) As to T.A. (Count 2, in her bedroom when they were in high school), no response is set forth.

2) As to J.E. (Count 3, at a party where multiple witnesses saw the event), defendant acknowledges intercourse, but denies J.E. was asleep or otherwise unaware of the sexual intercourse.

3) As to G.K. (Counts 8 and 9, attempted rape and strangulation at college), no response is set forth.

4) As to K.L. (Count 5, at the Dewey Beach house), defendant acknowledges consensual sexual intercourse with K.L.

5) As to M.P. (Count 1, at the pole barn where defendant lived), defendant admits touching and kissing occurred, but he denies penile-vaginal penetration.

6) As to A.L. (Counts 6 and 7, two rapes at the pole barn where defendant lived), no response is set forth.

## C) Discussion

Defendant asks this Court to sever the indictment so that the charges against each alleged victim are tried separately.[7] He invokes Superior Court Criminal Rule 14, which provides in

---

[7]Defendant is not alleging an improper joinder of the charges in the indictment.

13

pertinent part as follows:

> If it appears that a defendant ... is prejudiced by the joinder of offenses ... in an indictment ..., the court may order an election or separate trials of counts, ... or provide whatever other relief justice requires.

As explained in *Wiest v. State*:[8]

> The prejudice which a defendant may suffer from a joinder of offenses has been described in the following terms: 1) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; 2) the jury may use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and 3) the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges. (Citation omitted).

The Court further explained:

> Even if it is determined that the prejudice alleged by Wiest is not sufficient to *require* severance of separate offenses, a crucial factor to be considered in making a final determination on the motion should be whether the evidence of one crime would be admissible in the trial of the other crime. Traditionally, evidence of one crime is inadmissible to prove a general disposition to commit another crime, even if the crime is of the same nature and character as the offense charged. Evidence of other offenses is admissible when it has "independent logical relevance" and its probative value to the State has been balanced against the prejudicial effect on the defendant. (Emphasis in original; citations omitted).[9]

The Supreme Court recently affirmed this principle in *Bartell v. State*:[10]

> We have recognized that "a crucial factor to be considered [in the prejudice analysis] is whether the evidence of one crime would be admissible in the trial of the other crime, because if it were admissible, there would be no prejudicial effect in having a joint trial." FN 7 Evidence of other crimes is generally admissible if it has "independent logical relevance" and its probative value is not outweighed by the danger of unfair prejudice. FN 8

---

[8] 542 A.2d 1193, 1195 (Del. 1988) ("*Wiest*").

[9] *Id.* at n.3.

[10] 183 A.3d 1280, 2018 WL 1565636, * 1 (Del. Mar. 29, 2018) (TABLE).

14

FN 7 *Garden v. State*, 815 A.2d 327, 333-34 (Del. 2003) (citing *Wiest v. State*, 542 A.2d 1193, 1195 n. 3 (Del. 1988).

FN 8 *Getz v. State,* 538 A.2d 726, 730 (Del. 1988) (quoting *Diaz v. State*, 508 A.2d 861, 865 (Del. 1986).

Of course, in determining if evidence of one crime is admissible in the trial of another, the analysis set forth in *Getz v. State*,[11] must be followed:

(1) The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case. If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.

(2) The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b)[12] or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition.

(3) The other crimes must be proved by evidence which is "plain, clear and conclusive." (Citation omitted).

(4) The other crimes must not be too remote in time from the charged offense.

(5) The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403.

---

[11]538 A.2d 726, 734 (Del. 1988) (*"Getz"*).

[12]In Delaware Rules of Evidence, Rule 404, it is provided:

(a) Character Evidence.
(1) Prohibited Uses. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait. ***
(b) Crimes, Wrongs, or Other Acts.
(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

(6) Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105.

The threshold test is relevancy; the "misconduct must be logically related to the material facts of consequence in the case."[13]

> [R]elevancy consists of both materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues, or ultimate facts, in the case. Probative value is concerned with the tendency of the evidence to establish the proposition that it is offered to prove. Hence, a fact that is "of consequence" is material and evidence that advances the probability that it is as a party claims it to be has probative value. (Citations omitted).[14]

The Court in *Getz* succinctly explained: "The relationship of the offered evidence to the ultimate fact or issue is the key to admissibility of other misconduct evidence."[15]

Each case where a defendant seeks severance must be viewed on its own facts.[16] The defendant has the burden to establish prejudice.[17] Hypothetical prejudice is not sufficient; the defendant must show there is a reasonable probability that substantial prejudice may result absent the severance.[18]

I first consider the crucial factor: whether the evidence of one crime would be admissible in the trial of the other crime(s), because if it were admissible, there would be no prejudicial

---

[13] *Getz*, 538 A.2d at 731.

[14] *Id.*

[15] *Id.*

[16] *Howard v. State*, 704 A.2d 278, 281 (Del. 1998); *Wiest v. State, supra* at 1195.

[17] *Bates v. State*, 386 A.2d 1139, 1141 (Del. 1978); *State v. Allen*, 2003 WL 23274795, *2 (Del. Super. Dec. 9, 2003), *aff'd*, 953 A.2d 699 (Del. 2008).

[18] *Garden v. State*, 815 A.2d 327, 333 (Del. 2003); *Bates v. State, supra* at 1141-42.

16

effect in having a joint trial.[19] The question is whether the evidence is admissible for a permissible purpose; i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.[20]

The State generally states that motive, opportunity, absence of mistake or lack of accident are at issue here. There is nothing in the record to support that general contention.

Where identity, intent or plan is in issue, the State may offer misconduct evidence.

Identity is not in issue in this case.[21] The *modus operandi* exception[22] is a subset of the identity exception and is a means of identifying the defendant.[23]

The State argues the facts serve to elucidate defendant's state of mind during those encounters. Intent is not a means of getting in the other crimes evidence in this case. The *Getz* Court addressed the intent element in a rape in the first degree case, as follows:

> While the State does have the burden of proving intent, as an element of the offense of rape first degree, the requisite state of mind is demonstrated by proof of the defendant's "conscious object to engage in conduct of that nature." 11 *Del.C.* § 231(a)(1). Further, the jury may infer that intention from the circumstances surrounding the act charged. 11 *Del. C.* § 307(a). Thus where, as here, the State presents direct evidence, through the testimony of an alleged victim, that an attack occurred, no evidential purpose is served by proof that the defendant committed

---

[19]*Bartell v. State, supra.*

[20]D.R.E. 404(b)(2).

[21]Cf. *State v. Howard*, 1996 WL 190045 (Del. Super. Mar. 12, 1996), *aff'd*, 704 A.2d 278 (Del. 1998); *State v. Allen*, 2003 WL 23274795 (Del. Super. Dec. 9, 2002); *State v. Hammons*, 2001 WL 1729119 (Del. Super. Dec. 5, 2001).

[22]It is not a specified exception but it has been accepted as an exception in *State v. Allen, supra.*

[23]*State v. Rodriguez*, 2010 WL 1987520 (Del. Super. May 18, 2010), *aff'd*, 30 A.3d 764 (Del. 2011); *State v. Allen, supra; Hurst v. State*, 929 A.2d 157, 166 (Md. Ct. App. 2007).

other intentional criminal acts of the same type. (Footnote omitted).[24]

A plea of not guilty does "not present a predicate issue concerning intent sufficient to justify the State in attempting to negate lack of intent as part of its case-in-chief."[25]

The *Getz* Court also reviewed the "common plan or scheme exception." The Court explained:

> Evidence of similar criminal acts is generally admitted under the exception in two fact situations. The first involves the use of prior acts which are so unusual and distinctive that their relationship to the charged offense may establish identity.[26] The second basis for admissibility of other bad acts under the plan or scheme exception is where the other acts form part of the background of the alleged act, to which it is inextricable related and without which a full understanding of the charged offense is not gained.[27] The evidence of prior sexual contact in this case ... involved two other isolated events within the previous two years depicting no common plan other than multiple instances of sexual gratification. **Repetition is not, in itself, evidence of a plan and other "crimes of the sort with which he is charged" cannot be admitted against the defendant under that guise.** (Citations omitted; emphasis added).[28]

The State argues the facts about how defendant conducts himself is inextricably intertwined with the narratives the alleged victims have given about how he treated them on similar occasions.

Here, there are various scenarios involved, and some of the scenarios share similar facts. But for the situation involving J.E., the factual scenarios as presented to date by the State

---

[24]*Getz*, 538 A.2d at 733.

[25]*Id.*

[26]Again, identity is not at issue in this case.

[27] The factual scenario in *Younger v. State*, 496 A.2d 546 (Del. 1985) fits within this category.

[28]*Getz v. State*, 538 A.2d at 733.

18

establish "date rape" situations. The women were voluntarily with defendant. They consented to varying degrees of sexual contact. However, they did not consent to sexual intercourse and voiced their refusal to engage in sexual intercourse. Despite their objections, defendant had sexual intercourse with them. The J.E. situation differs from the other five (5) scenarios in that she was not conscious when defendant had sexual intercourse with her. However, her situation is similar to the other cases in that it shows a woman's consent is irrelevant to defendant when he decides to have sexual intercourse. The core question(s) for each case will be whether defendant had sexual intercourse with an alleged victim and if so, whether the alleged victim consented to sexual intercourse in that case. The facts surrounding those events, such as whether defendant pursued the "date" through social media or contacted the alleged victims after the sexual intercourse, do not answer these core questions.

Where consent is the core of a case, as it is based upon the facts set forth above, the general rule is that evidence of other sexual offenses is not admissible; that evidence, in the end, serves only to establish that a defendant is capable of committing the offense in question and thus, is likely to have committed the offense.[29] Intent to commit rape cannot be equated with consent.[30] Whether a defendant raped others in other situation(s) is not relevant to whether the

---

[29] *Hurst v. State, supra; Commonwealth v. Minor*, 591 S.E.2d 61 (Va. 2004);

[30] *Commonwealth v. Minor*, 591 S.E.2d at 66.

19

particular alleged victim consented[31] to sexual intercourse with the defendant.[32] What the State's facts show is that defendant has a general criminal disposition to "date rape" women. As noted above, repetition is not, in itself, evidence of a plan or scheme.[33] In this case, I do not find that the common plan or scheme exception applies.

I do not find that the evidence of any one of these crimes would be admissible in the trial of another. There is no permissible reason for admitting the evidence. The evidence of each crime shows that defendant had sexual intercourse with women despite their specific statements they did not wish to have sexual intercourse. This is nothing but evidence of defendant's trait to rape being introduced to prove that with regard to every other episode, defendant raped the alleged victim. There is a strong possibility that the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; 2) the jury may use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and 3) the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges.

I conclude defendant has shown there is a reasonable probability that substantial prejudice may result absent the severance. These cases cannot be tried together. Defendant's motion to sever is GRANTED.

---

[31]In Delaware, the focus on whether the alleged victim consented requires the Court and the State to refer to the person as an "alleged victim" instead of a "victim." *Fritzinger v. State*, 10 A.3d 603 (Del. 2010); *Mason v. State*, 692 A.2d 413, 1997 WL 90780 (Del. 1997) (TABLE); *Jackson v. State*, 600 A.2d 21 (Del. 1991).

[32]*Commonwealth v. Minor*, 591 S.E.2d at 67; *Lovely v. U.S.*, 169 F.2d 386 (D.C. Cir. Ct. App. 1948).

[33]*Brett v. Berkowitz*, 706 A.2d 509 (Del. 1998), citing *Getz v. State*, 730 A.2d at 733.

20

## II. State's Motion *in limine*

The State has filed a motion *in limine* wherein it seeks authorization to admit evidence of similar interactions defendant had with other women in order to show his "motive, intent, knowledge, preparation, planning and the absence of accident or mistake during his interactions with the alleged victims; to elucidate the defendant's state of mind during those encounters; and because evidence related to defendant's 'dating life' is inextricably intertwined with the means by which he first encountered and then subsequently ensnared his alleged victims."[34]

The Court will not detail the various episodes. They present similar stories about sexual events involving varying degrees of consent by the women. As was the case with the motion to sever, this evidence, at its core, attempts to establish that defendant had sexual intercourse with most of these women without their consent. Again, when the ultimate questions regarding the charged cases are whether the alleged victims had sexual intercourse with defendant and if so, whether they consented to such, then this evidence sought to be introduced is not being introduced for a valid reason under D.R.E. 404(b). Instead, it is being introduced to show that if defendant raped others, he also raped the alleged victims in this criminal case. The unfair prejudice which this evidence would occasion precludes its introduction.[35]

The State's motion *in limine* is denied.

## III. Motion to Dismiss Two Counts of Superceding Indictment

Defendant has moved to dismiss Counts 2 and 3 of the superceding indictment. Count 2

---

[34]State's Motion *in limine* to Admit Evidence under DRE 404(b), Docket Entry 105 at 1.

[35]D.R.E. 403.

21

charges defendant with committing the crime of rape in the second degree against T.A., alleging that on or about or between the 1st day of September, 2013 and the 20th day of September, 2013, defendant did intentionally engage in sexual intercourse with T.A., without her consent. Count 3 of the indictment charges defendant with committing the crime of rape in the second degree against J.E., alleging that on or between the 31st day of December, 2013 and the 1st day of January, 2014, defendant intentionally engaged in sexual intercourse with J.E., without her consent as that term in defined in 11 *Del. C.* § 761(j)(1) and/or § 761(j)(2).

The episodes leading to these charges initially were investigated in 2014. Defendant was not indicted on these charges until September, 2018.

Defendant argues he has been prejudiced by this delay. He argues his memory of the events is "substantially compromised as to critical details of what was said and what was done that provided the context of the sexual relations occurring between the two separate persons."[36] He also argues the witnesses will have compromised recollections. Finally, he argues the pre-trial publicity occasioned by the initial arrests in this case has brought considerable publicity that he would not have experienced had he been prosecuted in 2014.

The State explains that the Department of Justice did not charge defendant in 2014 after the investigating officer turned over the results of his investigation to the Department of Justice. Defendant was interviewed twice about the episodes. His attorney and father were present at those interviews. Those interviews were recorded; the recorded interviews have been turned over to defense counsel. Witnesses to the episode during New Year's 2014, also were interviewed and those recorded interviews have been turned over to defense counsel. The investigating officer's

---

[36]Defendant's Motion to Dismiss, Docket Entry 73 at 5.

case files were saved and defendant has been provided with an exhaustive list of witnesses and their current contact information. The alleged victims have been re-interviewed recently and those recordings have been provided to the defendant.

The State explains that the additional alleged victims added context to the 2013/2014 incidents. They show, according to the State, that defendant has a pattern of behavior of sexually assaulting women, which pattern, looking back, started with the 2013/2014 events. Thus, the investigations were reopened after the new accusations of rape were lodged in 2018.

As to the pretrial publicity argument, the State notes the argument is speculative and unsupported by any facts.

The Sixth Amendment right to a speedy trial is not applicable here.[37] What is at issue is whether a due process violation has occurred. As explained in *Preston*,[38] if a defendant proves that the State's delay in bringing the indictment was deliberate in order to gain an advantage over him or that the delay has caused actual prejudice in presenting his defense, then the indictment may be dismissed for a due process violation. However, "'that memories will dim, witnesses become inaccessible, and evidence be lost *** are not in themselves enough to demonstrate that (defendants) cannot receive a fair trial and to therefore justify the dismissal of the indictment.' (Citation omitted)."[39]

In this case, defendant has not alleged that the State deliberately delayed in bringing the indictment in order to gain an advantage over him. Instead, he has asserted actual prejudice

---

[37]*Preston v. State*, 338 A.2d 562, 565 (Del. 1975) ("*Preston*").

[38]*Id.* at 567.

[39]*Id.*

23

exists. However, he has not advanced any prejudice of any substance. His argument regarding pretrial publicity is speculative. It does not establish prejudice. His only other arguments assert dimmed recollections. Dimmed recollections are not sufficient to establish actual prejudice. Furthermore, in this case, the discovery information regarding previous statements and interviews should provide information to refresh defendant and the witnesses' recollections and thereby render meritless the "dimmed recollections" argument.

Defendant attempts to make the time period of four years a *per se* due process violation. There is no legal authority for that position.[40] Defendant must establish actual prejudice. He has not argued anything which would approach actual prejudice. Because the argument is insubstantial, no basis for a hearing on the matter exists.

For the foregoing reasons, the Court denies defendant's motion to dismiss Counts 2 and 3 of the superceding indictment.


## IV. Defendant's Motion for Production of *Brady* Materials and Motion for a Bill of Particulars

As a part of the investigation of defendant, the State Police seized two cell phones belonging to defendant when he was arrested. One was older and broken; the other was new.

The older phone poses an issue for the Court in connection with the pending motion. I will address the motion as it applies to that older phone later.

The State Police obtained a search warrant for the data stored in the new cell phone.

---

[40]*See State v. Summers*, 2013 WL 1087578 (Del. Super. Mar. 7, 2013) (nearly four and a half year delay between initial police contact and indictment).

24

Defendant purchased that phone on August 2, 2018. He was arrested on August 22, 2018. The State doubts there is information on this newer phone which addresses defendant's specific requests since the last charged offense occurred in July, 2018. Data was retrieved by a company named Celebrite, which then provided the data on a portable hard drive. A digital copy of this data, referred to as a "dump," was turned over to defendant in discovery.

Although as of April 26, 2019, when the State responded to this motion, the State had not been able to get into the older, broken phone, it has provided defendant with copies of numerous other items in its possession that satisfy defendant's *Brady* requests for photographs and/or communications between defendant and alleged victims before or after the date of the alleged criminal activities. The State represents it has produced to defendant all information relevant to his *Brady* requests.

Defense counsel had trouble sorting the information from the dump into a manageable format that could be searched easily. The State offered to meet with defense counsel and show him how to sort the information. Defense counsel declined to personally meet and receive these instructions. He did send his assistant to sit with the State. A Deputy Attorney General sat with the assistant and showed the assistant how to sort, manage and print the information from defendant's phone.

In his pending motions for production of *Brady* material and motion for a bill of particulars, defendant requests:

1) That the State be required to produce any photographic impressions of any of the alleged victims that were transmitted to the defendant either before or after the date of the alleged criminal activity.

25

2) That the State be required to produce any and all communications of a verbal and written nature during this time frame.

3) That, within the format of a bill of particulars, the State sort and index information in the cell phone.

The State explains that to the extent defendant is asking the State to specifically identify for him each individual phone call, text message, social media communication, or other file exchanged by the defendant and the alleged victims during the pertinent time frames, that information is located within the materials it has provided defendant. It objects to the sorting and indexing requirement as being beyond the scope of a bill of particulars.

As to the older, broken phone, the State represented in its April response to this motion that it had not searched the phone and did not have the capability, at that time, to search it. However, in May, 2019, the State obtained a search warrant for this phone. Apparently, attempts to retrieve information from that broken phone were to be made. However, the State has not updated its response to the pending motion so as of this time, the Court is unaware of whether any information was retrieved from the older phone and if it was, whether it was provided to defendant. Thus, the Court addresses the motion only within the confines of the information before it as of when the State filed its response thereto. If further developments have occurred and other issues are outstanding, then the parties will need to supplement the record.

With the caveat noted above, the Court concludes as follows. The State has produced the requested materials. The State does not have any obligation to sort and index the materials provided. Defense counsel's assistant should be able to accomplish most, if not all, of the sorting. However, whether or not the assistant can accomplish the sorting, defense counsel is not entitled

26

to the requested bill of particulars.

For the foregoing reasons, these motions are DENIED.

## V. Conclusions

For the reasons set forth above, the Court's rulings on the pending motions are as follows:

1) Defendant's motion to sever is GRANTED. The State will decide in which order it wishes to try its various charges.

2) The State's motion *in limine* to admit D.R.E. 404(b) evidence is DENIED.

3) Defendant's motion to dismiss Counts 2 and 3 of the superceding indictment is DENIED.

4) Defendant's motion for the production of *Brady* material and for a bill of particulars is DENIED.

**IT IS SO ORDERED.**